UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD MALKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-5829 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CLEVELAND CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

For decades, Bernard Malkowski worked as an accountant for Cleveland Corporation, a metal recycling company. They parted ways in 2017. Malkowski later filed this lawsuit, claiming that the company fired him because of his disability and age. The company responded that they let him go for cost-cutting reasons, and because he constantly threatened to leave.

Cleveland Corporation later moved for summary judgment. For the reasons that follow, the motion is granted in part and denied in part.

### Background

#### I.    The Parties

Cleveland Corporation runs a metal scrap recycling business in the Chicago suburbs. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 91). Joseph Kujawinski founded the company, but has since died. *Id.* at ¶ 5. Now, his two sons – Bob and Joey – run the business. *Id.* at ¶ 6. Bob owns 51%, and Joey owns the other 49%. *See* B. Kujawinski Dep., at 12:24 – 13:3 (Dckt. No. 81-3); J. Kujawinski Dep., at 14:16-23 (Dckt. No. 81-4).

The succession plan involves Bob's son, Michael Kujawinski (*i.e.*, the founder's grandson).[1] Bob and Joey plan for Michael Kujawinski to take partial ownership at some point in the future.[2] *See* Malkowski Dep., at 38:8-21 (Dckt. No. 81-2). Michael Kujawinski has worked for the company since 2004 and has served as the office manager since 2006. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 16–17 (Dckt. No. 91). He handles hiring and firing decisions (along with Bob and Joey) and works full time. *Id.* at ¶¶ 18, 20. From 2010 to 2016, he also managed tax documents. *Id.* at ¶ 19.

Bernard Malkowski met Joseph Kujawinski (again, the founder) in 1978. *See* Malkowski Dep., at 15:8-12 (Dckt. No. 81-2). Malkowski helped Joseph with an audit of Cleveland Corporation. Joseph kept him around to prepare the company's annual tax return and financial statements. *Id.* at 15:13 – 16:24. By the sound of things, it seems that Malkowski performed a series of one-off projects for the company during the next two decades, but did not join the payroll as an employee.

Malkowski's status changed in 1997, when he became an at-will employee of the company and served as an in-house accountant. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 1, 15 (Dckt. No. 91); Malkowski Dep., at 17:1 – 18:15 (Dckt. No. 81-2). But Malkowski did other accounting work on the side, too. He has run his own accounting business since the 1970s. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 3.

In addition to serving as the accountant, Malkowski worked as the company's CFO for a few years, departing from that role in 2014. *See* Malkowski Dep., at 94:12-19 (Dckt. No. 81-2);

---

[1] As discussed below, there are two Michaels in this case: Michael Kujawinski and Michael Wall. The Court will use their full names, to avoid confusion. (Using only their last names won't work, given the number of Kujawinskis in the case.)

[2] The parties disagree about how much ownership Michael will get, but it doesn't matter. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 8 (Dckt. No. 91).

B. Kujawinski Dep., at 174:7-23 (Dckt. No. 81-3); Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 33 (Dckt. No. 91). (But the parties do not reveal when he began that role.) All told, Malkowski worked with the company in some way, shape, or form for nearly 40 years.

According to the company, Malkowski's duties included general accounting, payroll, and maintenance of employee files. *See* Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 79). Malkowski describes his role as "handl[ing] accounts receivable, [and] accounts payable," adding that he "also had human-resources type duties, including but not limited to creating and maintaining personnel files when Defendant hired new employees." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 11 (Dckt. No. 91).

Most weeks, Malkowski came to work on Mondays, Wednesdays, and Fridays, for a total of about 24 hours a week. *Id.* at ¶ 12. Cleveland Corporation contends that, during tax season, he worked only on Wednesdays (payroll day) because he was busy with other clients through his private practice. *Id.* at ¶ 13; M. Kujawinski Dep., at 33:3 – 34:6 (Dckt. No. 89). But Malkowski testified that his schedule didn't change at all. *See* Malkowski Dep., at 134:6-14 (Dckt. No. 81-2). Either way, the punchline is that he didn't work full-time for the company, and he had other work on the side.

Starting in the 2000s, Malkowski had some health issues. In 2004, he requested and received time off for gastric bypass surgery. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 91). In 2013, he requested and received time off for prostate cancer. *Id.* He also had an arthritic condition that required hip surgery. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 79 (Dckt. No. 102). He could barely walk, endured pain when sitting, could not climb stairs, and kept a hospital bed at home. *Id.*

The parties don't provide any more specifics about his health issues, except to say that there were many. Bob testified that he "would need a scoreboard to keep up with [Malkowski's] health," and that Malkowski "requested a lot of time off for medical issues." *See* B. Kujawinski Dep., at 122:16-17, 149:21-22 (Dckt. No. 81-3). Michael Kujawinski agreed that Malkowski "gets sick quite a bit, and . . . sometimes he's had to take a week or two off . . . throughout the years." *See* M. Kujawinski Dep., at 138:18-20 (Dckt. No. 89).

Despite these issues, the company never denied Malkowski time off for a medical reason. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 69 (Dckt. No. 91).

## II. Resignation Announcements

Malkowski often discussed retiring or leaving the company. The record includes evidence about a few retirement announcements – a few were written, but most were verbal. The key point is that he expressed an intent to leave lots of times.

For example, on March 18, 2011, he sent a letter of resignation, effective March 25, 2011. *Id.* at ¶ 30. That departure didn't pan out, but the parties don't reveal why. In 2013, he verbally announced his intent to retire. *Id.* at ¶ 31. Again, the parties don't say what changed or why he decided to stay.

Malkowski also sent a letter announcing his retirement in early 2015. *See* 1/2/2015 Letter (Dckt. No. 81-6, at 3 of 21). The letter stated: "This letter is my official notification to you and to my company that my last day of work at Cleveland Corporation will be Friday, February 06, 2015. On that day, I plan to retire." *Id.*

Or, at the very least, it *appears* that Malkowski sent that letter. The letter appeared on stationary with "B. Malkowski" at the top, and it includes a signature. *Id.* The company views the letter as a third announcement of his retirement. *See* Def.'s Statement of Facts, at ¶ 34 (Dckt.

4

No. 79). Malkowski responded by stating that that fact was "[d]isputed." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 91). But he seems to be quibbling.[3]

Malkowski announced his intent to retire many other times. There is some dispute about how many times Malkowski announced his intent to leave, and who he told. One witness estimated that Malkowski said that he was retiring approximately 200 times from 2011 until he left the company. *See* Def.'s Statement of Facts, at ¶ 32 (Dckt. No. 79) (citing J. Kujawinski Dep., at 43–45 (Dckt. No. 81-4)). In response, Malkowski doesn't appear to deny that number, although he does point out that half of those alleged announcements went to someone who couldn't remember *any* announcements. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 32 (Dckt. No. 91). But the punchline is undisputed: Malkowski announced that he was leaving the company dozens of times from 2011 until the day he finally left.

To sum up so far, Malkowski worked for Cleveland Corporation indirectly for around two decades and directly for around two more. During that time, he experienced several health issues and often threatened to retire. Nothing in the record suggests that the company had issues with his health problems or with his retirement announcements before the end of 2016.

---

[3] It doesn't appear that Malkowski denies sending the letter. Malkowski appears to be saying that the company's Rule 56.1 statement doesn't cite testimony saying that he sent the letter. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 34 (Dckt. No. 91). In that sense, he's right. In the passage in question, counsel asked Malkowski about the content of the letter (*i.e.*, what it says), not whether he sent it. But still. Bob and Joey testified that they received the letter. *See* B. Kujawinski Dep., at 46:7 – 47:1 (Dckt. No. 81-3); J. Kujawinski Dep., at 48:19 – 49:12 (Dckt. No. 81-4). Malkowski doesn't offer any testimony saying that he *didn't* send it, or that the letter is a forgery. And in any event, the case does not turn on whether Malkowski sent this particular letter. So, even if this Court decided that there is a dispute about whether Malkowski sent this letter, it would not change the outcome because it is not a *material* fact. *See* Fed. R. Civ. P. 56(a).

### III.     The Search for a Replacement

By October 2016, the company began a search process for Malkowski's replacement. The record includes emails about the search.  And that search seems to suggest that Malkowski was departing the company by his own choice, at least at that point in time.  That is, Malkowski was potentially planning to retire.

But the emails are not entirely clear on the issue, and now Malkowski says that the company is misrepresenting his plans.  So the Court will walk through the documents chronologically.  For present purposes, the main point is that there was lots of discussion about Malkowski's future with the company.

First, the company produced two emails from Malkowski on October 28, 2016.  In one email, Malkowski asked Joey to "[p]lease hire or appoint someone in the office so [Malkowski] can show them the accounting functions [he] perform[s] as soon as possible."  *See* 10/28/2016 Email to Joey Kujawinski (Dckt. No. 81-6, at 5 of 21).

The company contends that this email shows that Malkowski announced his retirement once again.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 91).  Malkowski asserts that Cleveland Corporation mischaracterizes the email's content, but he sheds no light on what that response means.  *Id.*  In his deposition, he denied sending this particular email (even though it came from bernie@clevelandcorp.com).  *See* Malkowski Dep., at 146:10-16, 165:8-15 (Dckt. No. 81-2).

The second email from October 28, 2016 went from Malkowski to an outside accountant, Russell Cannizzo.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 36 (Dckt. No. 91). Malkowski stated that he would "stay around until [time estimates] are done so [he] can answer

any questions that [Russell Cannizzo] or Shayna might have."  *See* 10/28/2016 Email to Russell Cannizzo (Dckt. No. 81-6, at 4 of 21).

But the parties disagree about what it meant that Malkowski would "stay around."  The company suggests that Malkowski would stay with the company until the replacement was up to speed.  In his deposition, Malkowski claimed that the email referred to a vacation.  *See* Malkowski Dep., at 145:13-21 (Dckt. No. 81-2).

The record also includes a chain of emails from October 31, 2016.  *See* 10/31/2016 Emails (Dckt. No. 81-6, at 15–16 of 21).  Joey began the thread by forwarding the October 28 email from Malkowski to Joey.  *Id.*  In response, Bob asked if they had "some sort of blow up."  *Id.* at 15.  Joey answered that "[Malkowski] was just looking for a reason and he found one."  *Id.*  Michael Kujawinski ended the conversation, noting that "[Malkowski's] been talking about this for a long time.  It should be no surprise to anyone."  *Id.*  The parties agree that these emails are "discussing Bernie's retirement."  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 37 (Dckt. No. 91).

Malkowski sent another email on November 2, 2016.[4]  According to the header, Malkowski wrote the email to Bob, Joey, and Michael Kujawinski.  *Id.*  The first two paragraphs express concern with the financial state of the company, which the Court will address separately (below).  *See* 11/2/2016 Email (Dckt. No. 81-2, at 288 of 343).  For now, the Court focuses on the last two paragraphs.

Malkowski wrote that he requested that "Mike and Joey . . . prepare a list of all employees that left this company on bad terms," but then admitted "that would take too much

---

[4]  Malkowski testified that "[i]t appears that [he] sent this" and "[i]t sounds like something [he'd] write." *See* Malkowski Dep., at 154:4, 9-10 (Dckt. No. 81-2).  But he then testified that he doesn't remember drafting it.  *Id.* at 154:5-7.

time." *Id.* Instead, he suggested that they "prepare a list of all employees that left happy and on good terms after all that should take about ten seconds." *Id.* He then wrote about staying until the completion of the tax returns: "I have told Russ that I would stay on until the tax return is completed as Amy has said no extensions! I certainly hope that all this can be put behind us and we can part friends!" *Id.*

Around that time, the Kujawinski brothers began attempting to find a replacement for Malkowski. They understood all of the above emails to be signs that Malkowski was on his way out. Bob sent an email to Cannizzo on October 31, noting that "Bernie will be retiring soon" and asking whether he "knew of anyone, or the best place [they] can look outside of an agency." *See* 10/31/2016 Email (Dckt. No. 81-6, at 20 of 21). A flurry of emails from November 4 and 8 show a search for a new accountant – mostly spearheaded by Michael Kujawinski. *See* 11/4/2016 & 11/8/2016 Emails (Dckt. No. 81-6, at 7–14 of 21).

Pretty quickly, the company found its guy. In November 2016, Cleveland Corporation's attorney referred Michael Wall[5] (an outside CPA) to help with their accounting needs. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 42 (Dckt. No. 91); Wall Dep., at 15:6-14 (Dckt. No. 81-7). Michael Wall reached out to the company, and the brothers interviewed him in early December 2016. *Id.* at 15:1-5, 15-18; B. Kujawinski Dep., at 55:8-9 (Dckt. No. 81-3).

On December 28, Michael Wall emailed that he was "in the process of contacting Account Temps to see what their rates are to see if this is a temporary or permanent solution to having an accounting professional on site one to two days per week." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 45 (Dckt. No. 91). Michael Wall thought that Malkowski might have cost the company extra money. He wrote that "Bernie may have been padding his time based on

---

[5] Again, there are two Michaels: Michael Kujawinski (the founder's grandson) and Michael Wall (the outside accountant). To avoid confusion, the Court uses their full names.

[their] conversation," and "[o]ne of his goals before [their] next conversation is to determine how much [they] are currently paying for accounting services, Bernie's salary plus benefits and outside CPA." *Id.*

## IV.    Recurring Medical Issues

In December 2016 – the same month that the company interviewed Michael Wall – Malkowski told Cleveland Corporation that he would have hip surgery in April 2017. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 83 (Dckt. No. 102). At that point, he didn't know the exact date.

Malkowski revealed that he would need time off for the surgery. He testified that he "asked for time off for the surgery and time off for physical therapy," and he "told them that there would be a period of time that [he] would not be able to drive." *See* Malkowski Dep., at 22:15-19 (Dckt. No. 81-2).

The record does not include any information about what happened between Malkowski's surgery announcement in December 2016 and the beginning of his separation from the company in March 2017. So the Court will skip ahead to March 2017, too.

The record includes an email from Joey to Bob dated March 11, 2017. *See* 3/11/2017 Email (Dckt. No. 81-4, at 224-272). He forwarded the email from Malkowski (which he denied sending) dated October 28, 2016. *Id.* Joey then summarized a conversation with Malkowski about his future plans. "Just a recap from last year. I did ask him last week what he will do in his retirement. He is WAFFLING as he said Sandra is retired as of May 31 2017. He didn't say much other than he did not want to stay home." *Id.*

On March 24, Malkowski sent an email and clarified the exact schedule for his then-upcoming hip surgery. (Recall that Malkowski told the company in December that he would have surgery sometime in April 2017.) Malkowski notified the company that he would have hip surgery on April 18. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 83 (Dckt. No. 102). He reiterated that he "would not be able to drive for a few weeks." *Id.* at ¶ 84.

## V. The Departure

But before long, Malkowski was on his way out. On March 31, 2017, Joey told Malkowski to "pack [his] bags." *See* 4/7/2017 Email (Dckt. No. 90-1, at 2 of 3). Malkowski later memorialized that conversation in an email dated April 7. *Id.*; *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 46 (Dckt. No. 91).

In addition to the email, there is testimony in the record about a conversation during this time period between company management and Malkowski. *See* Michael Kujawinski Dep., at 99:21 – 100:10 (Dckt. No. 89). At some point in that timeframe, Joey and Michael Kujawinski met with Malkowski about his status with the company. Joey and Michael informed him that they were accepting his retirement. *Id.* The record is unclear about when, exactly, this meeting took place.[6]

---

[6] Paragraph 50 of the company's statement of facts says that the meeting took place on April 3, 2017. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 50 (Dckt. No. 91). Malkowski does not deny that date. *Id.* But the company relies on page 100 of the deposition transcript of Michael Kujawinski. In that passage, he described a meeting with Malkowski about accepting his retirement, and he testified that the meeting likely took place in late March. *See* Michael Kujawinski Dep., at 100:2-4 (Dckt. No. 89) ("I can't remember if it was – maybe near the end of March maybe. I think it was near the end of March."). He wasn't 100 percent sure. *Id.* at 100:11-12. It is not entirely clear from the submissions if that meeting (which appears to have taken place in late March) was the same meeting later described as taking place on April 2. The key point is that company management told Malkowski – possibly in late March, and possibly in early April – that it was time for him to go. That chronology is consistent with an email sent by Malkowski to Joey on April 7, 2017. *See* 4/7/2017 Email (Dckt. No. 90-1, at 2 of 3). Malkowski stated: "on March 31, 2017 you tell me to 'pack my bags.'" *Id.*

On April 2, Bob had a conversation with Malkowski about scheduling his retirement. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 47 (Dckt. No. 91). Bob asked Malkowski to stay until the date of his surgery, to help with the transition of duties to Michael Wall. *Id.* Malkowski responded that he did not want to retire after all, and he asked to remain with the company. *Id.*

Bob denied that request. The record does not include what, exactly, Bob said in response. But the key point is that Malkowski's days with the company were coming to an end. On April 2, Bob decided, as the majority shareholder, that Malkowski would no longer work for the company.[7] *Id.* at ¶ 48; *see also* 4/2/2017 Email (Dckt. No. 81-4, at 223 of 272) ("Spoke to Bernie today. Long story short, I asked him to stay on until his surgery to show the new guy our system . . . . [Malkowski] wants to stay on another year or two and please at least discuss keeping him on with Joey and Mike. I told him we pretty much decided to accept his resignation, but I would at least discuss it. Mike, just plan on Mike Wall getting in there Weds to go over things with Bernie. We need to stick to our guns and make the change now.") (email from Bob to Joey).

Bob then emailed Michael Kujawinski to train a new bookkeeper to free up Michael's time. *Id.* at ¶ 49.

On April 3, 2017, the company notified its corporate attorney that it had accepted Malkowski's retirement requests. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 85 (Dckt. No. 102).

---

[7] Defendant's statement of facts included the wrong date (2020, not 2017). It reads: "On April 2, 2020, Bob Kujawinski determined, as the majority shareholder, that Plaintiff's position would be eliminated." *See* Def.'s Statement of Facts, at ¶ 48 (Dckt. No. 79). Plaintiff caught the mistake, but wasn't much better. Plaintiff's correction of the mistake actually repeated the mistake, and added a typo, too. Plaintiff responded: "Disputed as to the typo. The correct dare [sic] is April 2, 2020 [sic]." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 48 (Dckt. No. 91).

On April 4, Malkowski told the brothers that he had a pre-operation chest x-ray, which showed a mass on his left lung.[8] *Id.* at ¶ 51; Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 87 (Dckt. No. 102). His doctors scheduled a bronchoscopy for April 7.[9] *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 51 (Dckt. No. 91).

At some point in April 2017, the company hired Michael Wall as its new accountant. *See* Wall Dep., at 46:10-16 (Dckt. No. 81-7). The record does not include the exact start date. But Joey and Michael Kujawinski met with Michael Wall on April 5, 2017 to discuss the transition of Malkowski's duties to Michael Wall. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 52 (Dckt. No. 91).

On April 7, Malkowski sent an email that addressed his future with the company. Malkowski clarified that he had "chosen not to retire at this time." *See* 4/7/2017 Email (Dckt. No. 90-1, at 2 of 3). In his view, an "employee has the right to change his or her retirement date up to and including the scheduled retirement date." *Id.* He also expressed surprise that the company recently had asked him to go, based on an email sent months earlier. "I find it strange that you received this from my email account on October 28, 2016 and five months later on March 31, 2017 you tell me to 'pack my bags.'" *Id.*

But Cleveland Corporation decided that it was time for him to go. On April 7, the company decided to end Malkowski's employment on April 10. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 91) (admitting that "Defendant decides on April 7, 2017

---

[8] The record does not reveal when Malkowski learned about the mass on his lung. The record merely covers when he told the company about the mass. As an aside, the complaint – which isn't evidence – alleges that Malkowski learned about the mass in February 2017. *See* Cplt., at ¶ 14 (Dckt. No. 1).
[9] Based on the record, it appears that doctors initially set the lung procedure for April 7. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 51 (Dckt. No. 91); *see also* 4/4/2017 Email (Dckt. No. 81-4, at 220 of 272). But it appears that the procedure actually took place on April 10. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 87 (Dckt. No. 102).

that Plaintiff's employment will officially end on April 10, 2017"); *see also* 5/4/2018 Email

(Dckt. No. 90-1, at 2 of 3) ("This email was sent to Joey from Bernie on Friday April 7th 2017.

At this time we were trying to figure out from him when his final day of work would be. . . . We

decided to let him go on Monday April 10th.") (forwarding the email sent by Malkowski on April

7).

The relationship between the company and Malkowski was strained at that point. On

April 7, the company's counsel communicated with Malkowski. *See* Pl.'s Resp. to Def.'s

Statement of Facts, at ¶ 55 (Dckt. No. 91). The record does not reveal what, exactly, they

discussed. But the upshot is that counsel was concerned for the company. Based on that call,

counsel contacted Bob and recommended that the company cut Malkowski's access to the

company's computer system. *Id.*

Sure enough, on April 10 – the day of his bronchoscopy – Malkowski came to work and

discovered that he couldn't access the company's QuickBooks. *Id.* at ¶ 56. Just like that, he

realized that the company no longer employed him. *Id.* At the time, he was 62 years old. *See*

Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 101 (Dckt. No. 102).

The record does not reveal what else, if anything, was said on Malkowski's last day of

work. The point is that Malkowski came to work on April 10, but couldn't get access to the

computers. So he apparently left, for good. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 87

(Dckt. No. 102) (agreeing that it is "Undisputed" that the company "terminated Plaintiff on April

10, 2017").

The record includes evidence linking the date of the departure to the date of the surgery.

Michael Kujawinski testified that the company thought it was "a perfect time" to part ways

because Malkowski was going to be "off his feet for a while" and "his wife was retiring." *See*

Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 93 (Dckt. No. 102) (quoting M. Kujawinski Dep., at 101:20 – 102:5 (Dckt. No. 89)).

## VI.    The Replacement

After Malkowski's departure, Michael Kujawinski took over payroll and some hiring duties.  *See* M. Kujawinski Dep., at 20:6-24 (Dckt. No. 89).  One week after Malkowski left, Michael Kujawinski started using an outside firm (Cirrus) for payroll taxes and deductions.  *Id.* at 50:6 – 51:2.  Michael Wall also began working part-time for the company – first once a week, then once every two weeks, and currently once a month.  *See* Wall Dep., at 47:1-22, 48:2-25 (Dckt. No. 81-7).  He also handles phone calls and correspondence from time to time.

Cleveland Corporation asserts that Michael Kujawinski assumed the remainder of the duties.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 59 (Dckt. No. 91) (citing Wall Dep., at 50 (Dckt. No. 81-7)).  Malkowski denies this fact as "vague," but offers no other evidence.

Elsewhere, Malkowski admits that Michael Kujawinski effectively replaced him.  In his statement of facts, Malkowski states that "Mike Kujawinski, who was 31 years old as of the date of Plaintiff's termination, took over most if not all of Plaintiff's duties, and Defendant alleges Mike Wall, who was 44 years old at that time, took over some of the rest.  Alishia Starter, a female in her late 20s or early 30s also took over some of Plaintiff's duties."[10]  *See* Pl.'s Statement of Facts, at ¶ 100 (Dckt. No. 91) (citations omitted).

Cleveland Corporation agreed that Michael Kujawinski took over "most" (but not "all") of Malkowski's duties.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 100 (Dckt. No. 102).

---

[10]  Michael Wall testified that Malkowski's duties were transferred to "Mike Kujawinski and others within the company," with Michael Kujawinski beginning "weekly payroll" and "certain banking transactions" like "initiating electronic payments."  *See* Wall Dep., at 49:16 – 50:18 (Dckt. No. 81-7).  The phrase  "others within the company" referred to Alishia Streeter (maybe her last name is "Starter"), who took over filing responsibilities.  *Id.* at 50:19 – 51:4.  Otherwise, Michael Wall didn't know of anybody else who took on Malkowski's roles.  *Id.* at 51:11-14.

So, the parties agree that Michael Kujawinski took over the lion's share of Malkowski's former role.

Taken together, Michael Kujawinski (and Cirrus), Michael Wall, and Alishia Streeter replaced Malkowski.

## VII. Other Possible Reasons for Termination

The parties present other facts about why Malkowski left the company. Cleveland Corporation points to the need to cut costs. But Malkowki believes that the company retaliated against him by speaking up about two issues.

Both parties agree that Malkowski told Bob, Joey, and Michael Kujawinski that the company's financial situation was not good. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 91). Malkowski worried about the company's cash flow and believed that it might need to file for bankruptcy. *Id.* He specifically thought that the company spent too much money. *Id.* at ¶¶ 28–29.

Cleveland Corporation didn't look far when deciding where to cut. They terminated Malkowski's position. Bob testified that the company parted ways with Malkowski to cut costs. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 93 (Dckt. No. 102). He testified that the company saved about $35,000 a year by switching from Malkowski to the new team. *See* B. Kujawinski Dep., at 216:20-22 (Dckt. No. 81-3).

Malkowski disputes the notion that the company saved money, and he relies on a few pieces of evidence. The first piece is Joey's testimony. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 91). But that passage supports the company's position.

Joey (again, one of the brothers) testified that the company paid the new team (Michael Kujawinski and the outside consultant, Michael Wall) *less* than it paid the old team (Malkowski

and the outside consultant, Cannizzo). *See* J. Kujawinski Dep., at 188:19 – 189:6 (Dckt. No. 81-4). That's consistent with the notion that the company saved money by letting Malkowski go. True, Joey didn't know the exact amount of the savings. *Id.* But the key point is that the company saved money without Malkowski on the payroll.

In a similar vein, Malkowski disputes the notion that the company saved money by pointing to the fact that the company expanded its accounting services (and the inference is that more services must cost more money). In his view, "the actions Defendant took relative to Plaintiff's position were to 'upgrade their accounting services,'" and the company "expanded its staff and added other services, such as outside human resources." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 27 (Dckt. No. 91). But the relevant question is the existence or non-existence of cost savings. And on that issue, Malkowski comes up empty. He does not offer any evidence that any of the new services cost more money.

So there is no genuine dispute about whether Cleveland Corporation saved money with the move. There is evidence that the company saved money, and there's no contrary evidence.

Malkowski believes that the company fired him because of his medical issues, and because of his age. But Malkowski believes that there were other reasons, too. Specifically, he suggests that the company fired him in retaliation for two decisions that he made.

The first alleged retaliation involved employment eligibility verification forms, called I-9s. Starting in 2013 or 2014, Malkowski refused to sign the I-9s. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 61 (Dckt. No. 91). Malkowski thought that Cleveland Corporation hired undocumented workers, so he refused to sign their paperwork. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 111 (Dckt. No. 102). Malkowski claims that his bosses were mad about his refusal to sign the I-9s, and so they fired him.

16

The record is not entirely clear about when, exactly, Malkowski stopped signing the I-9s. According to his deposition, he refused to sign certain forms until 2016. *See* Malkowski Dep., at 51:13-16 (Dckt. No. 81-2). Malkowski offered evidence, though, that at least one I-9 was left unsigned in 2017 in the last few weeks of his employment. *See* I-9 Spreadsheet (Dckt. No. 90-3). Neither party offers evidence of *who* left these documents unsigned (that is, it is not clear whether Malkowski was supposed to sign those forms in 2017). But Malkowski's statement of facts suggests that they "*could have been* instances where [he] complained about signing off on them." *See* Pl.'s Statement of Facts, at ¶ 110 (Dckt. No. 91) (emphasis added).

There is a disputed issue about the company's level of unhappiness about that issue. Malkowski claims that the company "was not happy" about his refusal to sign some I-9s. *See* Pl.'s Statement of Facts, at ¶ 111 (Dckt. No. 91). On the flipside, Joey testified that he was "[m]ore puzzled by it than upset" and he had no knowledge of "displeasure" from anyone else. *See* J. Kujawinski Dep., at 152:13-17, 153:7-13 (Dckt. No. 81-4). And Michael Kujawinski never suggested that anyone was angry, either. He testified that Malkowski and the owners once went "back and forth about it" before the papers were filled out. *See* M. Kujawinski Dep., at 158:12 – 159:6 (Dckt. No. 89).

So there may have been unhappiness. But there isn't any evidence of any adverse action. Malkowski testified that Joey "was not happy, but he did not threaten" his job. *See* Malkowski Dep., at 46:7-10 (Dckt. No. 81-2). "Plaintiff's job was never threatened for his refusal to sign I-9 documents." *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 60 (Dckt. No. 91).[11]

---

[11] In response to the company's statement of facts, Malkowski attempted to dispute the notion that the company never threatened his job for failing to sign the I-9s. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 60 (Dckt. No. 91) ("Disputed."). But he lacks supporting evidence. Malkowski cites a passage of Joey's deposition. *Id.* But the passage in question says that opposite of what Malkowski claims. Joey explicitly testified that the company never threatened his job. So Malkowski attempts to dispute the company's fact, based on testimony that squarely supports the company's fact.

The second alleged retaliation involved the content of a year-end accounting statement. Malkowski told Cannizzo (again, the outside consultant) about potential liabilities to Racine Metals.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 102 (Dckt. No. 102).  Cannizzo, in agreement with Malkowski, then included a footnote in the company's financial statement for the 2015-2016 year that disclosed those potential liabilities.  *Id.* at ¶¶ 102, 112; Malkowski Dep., at 35:13-18 (Dckt. No. 81-2).  The company's attorney believed that the company didn't need to include the footnote because, in his view, the company had no such liabilities.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 113.

Cannizzo, not Malkowski, included the footnote in the draft financial statement.  Even though Cannizzo (not Malkowski) inserted the footnote, "Bob was very, very upset" with Malkowski anyway because the last draft that he received included the footnote.  *See* Malkowski Dep., at 35:5-10, 99:8-13 (Dckt. No. 81-2).

In the end, the company included the footnote in the final version of the financial statements.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 102 (Dckt. No. 102); Cannizzo Dep., at 56:6 – 65:8 (Dckt. No. 81-8).  And the company didn't retain Cannizzo for the next year. *Id.* at 75:5-13; 12/7/2016 Emails (Dckt. No. 90-4).

Malkowski suspects that the company terminated him and decided not to retain Cannizzo because of this disagreement.  The Kujawinskis agree that the disagreement drove the decision to not retain Cannizzo.  *See* B. Kujawinski Dep., at 73:20 – 74:13 (Dckt. No. 81-3) (discussing an email where Bob wrote that they "will not be signing [Cannizzo's retention] agreement" in part because "[h]is undocumented disclosure and his lack of communication with the company officers is not in the company's best interest").

But Bob allegedly assured Malkowski that the decision to part ways with him had nothing to do with the disclosures. In an April 2 email, Bob memorialized a conversation that he had with Malkowski earlier that day. He told Malkowski that he and the firm would part ways soon. *See* 4/2/2017 Email (Dckt. No. 81-4, 223 of 272). During that discussion, Bob says that Malkowski "brought up [the Racine disclosures] due to a guilty conscience." *Id.* Bob then clarified to Malkowski that he "was disappointed with his and [Cannizzo's] decisions" but "not mad," and "[i]f he was mad about that [he] would have fired [him] months ago." *See* 4/2/2017 Email (Dckt. No. 81-4, at 223 of 272).

But Malkowski thinks that Bob lied to him. Malkowski believes that the company let him go partly because he was blamed for the footnote in the financial statement.

## VIII.  The Lawsuit

In January 2018, Malkowski timely filed a charge of discrimination with the EEOC, alleging age and disability discrimination as well as retaliation. *See* Charge of Discrimination, at 1 (Dckt. No. 1-1). The EEOC provided him with a Notice of Rights letter shortly after. *See* Dismissal and Notice of Rights (Dckt. No. 1-2).

Malkowski later filed this suit against Cleveland Corporation. He brought five claims, including claims under the ADA (Count I), the ADEA (Count II), the Illinois Human Rights Act ("IHRA") (Counts III & IV), and Illinois common law (Count V). *See* Cplt. (Dckt. No. 1). After discovery, Cleveland Corporation moved for summary judgment on all five counts.

### Legal Standard

Rule 56 provides that the Court "shall grant" summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250 (cleaned up).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quotation marks and citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted).

**Analysis**

Cleveland Corporation moves for summary judgment on all five counts. Counts I and III allege disability discrimination under the ADA and the IHRA (again, the Illinois Human Rights Act), respectively. Counts II and IV allege age discrimination under the ADEA and the IHRA, respectively. Count V alleges a common law claim for retaliatory discharge under Illinois law. The Court will group the claims and consider them in that order.

## I.      Disability Discrimination

Malkowski's complaint asserts two types of disability discrimination. First, he claims that his termination violated the ADA and the IHRA. *See* Cplt., at ¶¶ 47–49, 76 (Dckt. No. 1).

20

Second, he contends that Cleveland Corporation's failure to accommodate him for his disability violated the ADA and the IHRA. *Id.* at ¶¶ 50, 77.[12]

Disability claims under the ADA use the same methods and the same frameworks as disability claims under the IHRA. *See Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013). So, for simplicity's sake, the Court only discusses the ADA, but the same analysis applies to both claims.

### A.     Termination

Traditionally, the Seventh Circuit has allowed a plaintiff to survive a motion for summary judgment for an ADA claim by "two different methods." *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014). The first method – the direct method – requires the plaintiff to "show that a genuine issue of material fact exists with respect to each of the three elements he will eventually be required to prove at trial:  (1) that the plaintiff is disabled within the meaning of the ADA; (2) that the plaintiff is qualified to perform the essential functions of the job with or without accommodation; and (3) that the plaintiff has suffered an adverse employment action because of his disability." *Id.*

The second method – the indirect method, also known as the *McDonnell Douglas* burden-shifting framework – is a multistep process. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973) (establishing the framework in Title VII race discrimination cases). The plaintiff must first "establish[] a *prima facie* case by showing:  (1) that he is disabled under the ADA; (2) that he was meeting his employer's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that similarly situated employees without a disability were treated more favorably." *Bunn*, 753 F.3d at 685. If the plaintiff successfully satisfies his burden,

---

[12]  His complaint also alleged retaliation for his request for accommodation. *See* Cplt., at ¶ 51 (Dckt. No. 1). But he seemingly abandoned that theory in the summary judgment motions.

then "the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant meets its burden of production, then the plaintiff must "prove by a preponderance of the evidence that the employer's stated reason is a lie." *Id.*

But the Seventh Circuit has shifted away from these two methods (without disapproving of them). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). To that end, the Court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." *Id.*

Cleveland Corporation makes an argument against Malkowski's ADA claims under the direct method. *See* Mem. in Support of Def.'s Mtn. for Summ. J. ("Def.'s Mem."), at 6–8 (Dckt. No. 78). The company argues that Malkowski did not have a disability, and that any such disability was not the but-for cause of his departure from the company. Malkowski responds that he met his burden under both the direct and indirect methods. *See* Pl.'s Mem. in Opp. to Def.'s Mtn. for Summ. J. ("Pl.'s Mem."), at 5–9 (Dckt. No. 92).

The parties frame their arguments using the traditional approach, meaning the direct method and the indirect method. So the Court "will begin [its] assessment of the evidence by employing [those] construct[s] and addressing first whether [Malkowski] has established a prima facie case of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Neither party addresses *Ortiz* in detail. Even so, this Court will follow Seventh Circuit instructions and "assess cumulatively all the evidence presented by [Malkowski]

to determine whether it permits a reasonable factfinder to determine that" his separation from Cleveland Corporation "was attributable to" his disabilities. *Id.*

To preview what's to come, this Court concludes that Malkowski has presented enough evidence to get to a jury on his disability claim about his termination (only).

### 1. Direct Method

Under the direct method, Malkowski must show that (1) he has a disability within the meaning of the ADA; (2) he is qualified to perform his job's essential functions with or without accommodation; and (3) his disability caused his adverse employment action. *See Bunn*, 753 F.3d at 683. Cleveland Corporation challenges only the first and third prongs. *See* Def.'s Mem., at 7–8 (Dckt. No. 78).

Cleveland Corporation begins with the first element, arguing that Malkowski does not have a disability. A disability under the ADA is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *See* 42 U.S.C. § 12102(1); *see also Bay v. Cassens Trans. Co.*, 212 F.3d 969, 973 (7th Cir. 2000).

Cleveland Corporation downplays his medical conditions. The company argues that the lung screening eventually showed that Malkowski did not have cancer, and a *potential* cancer diagnosis is not a disability. Also, the company contends that his arthritis does not qualify, either, because Malkowski merely had difficulty walking. Both arguments miss the mark.

The parties agree that Malkowski had prostate cancer in 2013. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 78 (Dckt. No. 102). Then, during a preoperative screening in 2017, doctors found a mass on Malkowski's left lung that required a bronchoscopy. *Id.* at ¶ 87.

That evidence is sufficient to prove a disability under the ADA, for three reasons. First, the definition of a disability includes a "*record* of such an impairment," 42 U.S.C. § 12102(1) (emphasis added), which "include[s] people who have recovered from previously disabling conditions (cancer or coronary disease, for example) but who may remain vulnerable to the fears and stereotypes of their employers." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 509 (7th Cir. 1998). A reasonable jury could find that Malkowski had a disability because he recovered from cancer, and then faced a potential second bout.

Second, courts generally find that cancer – in remission or not – substantially limits a major life activity (*i.e.*, normal cell growth). *See, e.g.*, *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1185–86 (E.D. Tex. 2011); *Chalfont v. U.S. Electrodes*, 2010 WL 5341846, at *9 (E.D. Pa. 2010); *Hoffman v. Carefirst of Fort Wayne, Inc.*, 737 F. Supp. 2d 976, 984–86 (N.D. Ind. 2010). Ask anyone who's had it.

Third, Cleveland Corporation's argument that "further screening showed that he did not [have] cancer" is immaterial. *See* Def.'s Mem., at 7 (Dckt. No. 78). "Whether or not an individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made." *Bay*, 212 F.3d at 974. Malkowski recovered from cancer once, and he told the company on April 4, 2017 that he had a mass on his lungs. A jury could find that his employer might regard him as someone with cancer, or at least someone with a risk of getting cancer again. *See* 42 U.S.C. § 12102(1)(C) ("The term disability means, with respect to an individual . . . being regarded as having such an impairment[.]"); 42 U.S.C. § 12102(3) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited

24

under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.").

Any way you cut it, there is a genuine issue of material fact about whether Malkowski's cancer counted as a disability.

Cleveland Corporation's second argument is that "mere difficulty in walking" is not a disability that could give rise to an ADA claim. *See* Def.'s Mem., at 7 (Dckt. No. 78). But the company undersells the facts.

Malkowski had an arthritic condition that required hip surgery. He could "barely walk," "endured pain when sitting," "could not walk upstairs," and "was forced to have a hospital bed in his home." *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 79, 84 (Dckt. No. 102). A "major life activity" under the ADA includes walking. *See* 42 U.S.C. § 12102(2)(A). A reasonable jury could find that Malkowski's arthritis substantially interfered with his ability to walk. *Contra Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 951 (7th Cir. 2000) (rejecting arthritis as a significant impairment when it only affected the "'rate and pace' of [the plaintiff's] activities as opposed to his ability to perform them"). Based on the facts at hand, a reasonable jury could find that Malkowski's arthritis constituted a disability.

Cleveland Corporation then turns to the third element, causation. "[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability; proof of mixed motives will not suffice." *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010).

A plaintiff can prove but-for causation using "either direct or circumstantial evidence." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). The former "would be an admission that the defendant fired the plaintiff on the basis of his disability." *Id.* The latter may

include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (citation omitted).

The company argues that Malkowski cannot show that his disabilities were the but-for cause of his departure. The company points to three facts that show, in its view, that Malkowski's medical issues did not cause his employment to end. First, the company never denied Malkowski any medical leave. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶¶ 69, 74 (Dckt. No. 91). Second, Malkowski requested leave in December 2016, but the company didn't let him go until April 2017. *Id.* at ¶ 75. Third, Malkowski has no evidence of animus from the Kujawinski brothers or the company generally. *See* Def.'s Mem., at 7 (Dckt. No. 78).

Malkowski offers two responses. He begins by calling into question the but-for causation standard itself, albeit in a tepid way. He points out that the company failed to "provide any authority in support other than citing the rule that a plaintiff must prove but-for causation in ADA cases." *See* Pl.'s Mem., at 5 (Dckt. No. 92).

Before the 2009 amendments to the ADA, plaintiffs had to show but-for causation. *See Serwatka*, 591 F.3d at 962. Recently, though, the Seventh Circuit observed that "it is an open question whether" the amendments "change[d] the 'but for' causation standard." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Malkowski faults the company for failing to offer support for the but-for causation standard. But Malkowski doesn't request a different standard, either. He offers no replacement. You can't replace something with nothing. Because "the parties in this case have not argued that

another causation standard should apply," the Court "will continue to apply the 'but for' causation standard." *Id.*

Next, Malkowski argues that he can establish but-for causation, through both direct and circumstantial evidence. He begins with direct evidence. Malkowski points to the disagreement about whether Bob fired Malkowski or merely eliminated Malkowski's position. *See* Pl.'s Mem., at 6 (Dckt. No. 92) (citing Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 48 (Dckt. No. 91)). But that dispute is about whether Malkowski suffered an adverse employment action at all, not the reason behind that action. The causation question is why the company let him go, not whether he was fired.

Malkowski's next argument isn't much better. He argues that he has "direct evidence of Defendant's animus towards him based on his disability." *Id.* (citing Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 81 (Dckt. No. 91)). But the testimony in question cannot support a finding of animus. It shows that the Kujawinski brothers were aware that Malkowski often suffered from medical conditions. *See* Def.'s Reply Mem. in Support of its Mtn. for Summ. J. ("Def.'s Reply"), at 8 (Dckt. No. 101). An awareness of a medical issue is not the same thing as an animus about a medical issue. (But it can be a piece of the puzzle.)

Even so, based on the circumstantial evidence in the record, the Court concludes that a reasonable jury could find that Malkowski's medical condition was the but-for cause of his departure from the company. A reasonable jury could find that the company timed his exit based on the timing of his surgery to treat his disability. He was shown the door right before his surgery.

Consider the timing. In December 2016, Malkowski told the company that he would have surgery sometime in April 2017. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 83

27

(Dckt. No. 102). He also told the company that he would need time off for his surgery and recovery. *See* Malkowski Dep., at 22:15-19 (Dckt. No. 81-2).

True, the company didn't show him the door right away, but that fact does not preclude a claim. In December, the company knew how long they could benefit from his services before he needed time away for medical reasons. And they had good reason to keep an accountant on the books through April: tax season. A reasonable jury could find that the company deferred the decision to let him go because it was in the company's interest to keep him working for a few more months.

Months later, the company learned the exact date of his procedure. On March 24, 2017, Malkowski reminded the company about his upcoming surgery, and told them that it was set for April 18. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 83 (Dckt. No. 102). He also told them that he would not be able to drive for a few weeks. *Id.*

Less than a week later, the company told him to go. On March 31, 2017 – the last day before the month of the surgery – Bob met with Malkowski about his future with the company. Bob told him to "pack [his] bags." *See* 4/7/2017 Email (Dckt. No. 90-1, at 2 of 3); *see also* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 46 (Dckt. No. 91). So Malkowski was on his way out, but the day of his departure was to be determined.

On April 2, 2017, Bob sent an email to Joey about Malkowski's upcoming exit. Tellingly, Bob pegged Malkowski's departure date to Malkowski's surgery: "Spoke to Bernie today. Long story short, I asked him to stay on *until his surgery* to show the new guy our system . . . ." *See* 4/2/2017 Email (Dckt. No. 81-4, at 223 of 272) (emphasis added).

Two days later, Malkowski revealed another medical condition, requiring another medical procedure. On April 4, Malkowski told the brothers that he had a pre-operation chest

x-ray, which showed a mass on his left lung.[13]  *Id.* at ¶ 51; Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 87 (Dckt. No. 102).  He needed a bronchoscopy on April 7.[14]  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 51 (Dckt. No. 91).

On April 7, Malkowski sent the email saying that he had decided not to retire after all.  *See* 4/7/2017 Email (Dckt. No. 90-1, at 2 of 3).  But the company had made up its mind, and decided that Malkowski's time had come.  *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 54 (Dckt. No. 91) (admitting that "Defendant decides on April 7, 2017 that Plaintiff's employment will officially end on April 10, 2017"); *see also* 5/4/2018 Email (Dckt. No. 90-1, at 2 of 3) ("This email was sent to Joey from Bernie on Friday April 7th 2017.  At this time we were trying to figure out from him when his final day of work would be. . . . We decided to let him go on Monday April 10th.") (forwarding the email sent by Malkowski on April 7).

Viewing that chronology as a whole, a reasonable jury could raise its eyebrows at that timing.  A reasonable jury could find that the company let him go in early April because of his ongoing medical issues.

"Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment."  *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015).  Suspicious timing isn't always enough, but suspicious-timing-plus can get a plaintiff over the summary judgment hurdle.

---

[13]  The record does not reveal when Malkowski learned about the mass on his lung.  The record merely covers when he told the company about the mass.  As an aside, the complaint – which isn't evidence – alleges that Malkowski learned about the mass in February 2017.  *See* Cplt., at ¶ 14 (Dckt. No. 1).

[14]  Again, the parties agree that the bronchoscopy ended up happening on April 10, not April 7.  *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 87 (Dckt. No. 102).

.

And here, there is more than suspicious timing. Recall that Bob pegged Malkowski's departure date to the date of Malkowski's surgery. *See* 4/2/2017 Email (Dckt. No. 81-4, at 223 of 272) ("Spoke to Bernie today. Long story short, I asked him to stay on *until his surgery* to show the new guy our system . . . .") (emphasis added). Maybe there is an innocent explanation. Maybe he simply didn't want Malkowski to retire *before* the date of his surgery. But at summary judgment, Malkowski – not the company, the movant – gets the inferences in his favor.

There is other evidence that the surgery had something to do with the departure date. At his deposition, Michael Kujawinski testified about how he delivered the news to Malkowski that they were letting him go. He testified that they told him that they were going to accept his retirement. And he pointed to the fact that he was "going to be taking time off near the end of the tax season," and "he's going to be off his feet for a while." Specifically:

> I just – yeah, I pretty much said, you know, 'We're – we're going to accept, you know, your – you know, your retirement, and we're hoping that, you know, by the end of' – because he told – yeah, he told us, yeah, he's like – *he's going to be taking time off* near the end of tax season, and he's going to be off his – you know, *he's going to be off his feet for a while,* and all that stuff, and his wife was going to retire, and we were telling him, you know, 'Well *maybe this is a perfect time,* you know, since you wanted to, you know, go.

*See* M. Kujawinski Dep., at 101:20 – 102:5 (Dckt. No. 89) (emphasis added).

That answer is long and a bit convoluted at times. (The passage above is simply a small part of a much longer answer.) But it does support the notion that the company linked Malkowski's exit with his medical leave.

The record may not be overwhelming in Malkowski's favor. But it doesn't need to be overwhelming to get to a jury. The question is not whether Malkowski is likely to prevail at trial, or has the better evidence. Instead, the question is simply whether there is enough in the

record to support a finding by a reasonable jury that the company let him go because of his disability. And here, the Court concludes that there is enough – *just* enough.

### 2. Indirect Method

Malkowski presented enough evidence to get to a jury under the direct method. Strictly speaking, there is no need to cover the indirect method, because the case is headed to trial. But the Court will walk through the analysis for the sake of completeness.

The indirect method (meaning the *McDonnell Douglas* burden-shifting framework) starts with the burden on the plaintiff. If the plaintiff establishes a *prima facie* case, then the burden flips to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. If the defendant offers a reason, then the burden reverts back to the plaintiff to show that the proffered reason is pretextual. *See Bunn*, 753 F.3d at 685.

To make a *prima facie* case, Malkowski must show that he (1) has a disability under the ADA, (2) met his employer's legitimate expectations, and (3) suffered an adverse employment action, and must show that (4) the company treated similarly situated employees without a disability more favorably. *Id.*

Malkowski presented enough evidence to make a *prima facie* case. The facts could support a finding that he has a disability under the ADA. There is no dispute that he met the company's legitimate expectations. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 82 (Dckt. No. 102) ("Plaintiff had the requisite education, experience, and skills for the job."); *id.* at ¶ 88 ("During the twenty years Plaintiff worked for Defendant, he was never disciplined in any way, he was never placed on a performance improvement plan, and he was never demoted."). He suffered an adverse employment action because the company let him go, and there is sufficient evidence to support a finding that the company terminated him. *See Bagwe v.*

31

*Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 889 (7th Cir. 2016) ("A termination is undoubtedly an adverse employment action."). And the company replaced him with two people (Michael Kujawinski and Michael Hall) who don't have a disability. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 90. So Malkowski carried his initial burden.

The burden then flips to Cleveland Corporation to provide a legitimate, nondiscriminatory reason for letting him go. The "mere production of [a] legitimate non-discriminatory reason for its action rebuts the presumption of discrimination created by the prima facie showing." *Rand v. C.F. Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994).

Cleveland Corporation presented evidence of two reasons for terminating Malkowski's employment.[15] First, the company "needed to cut costs and the elimination of the position saved the company $35,000 annually." *See* Def.'s Mem., at 9 (Dckt. No. 78); *see also* B. Kujawinski Dep., at 216:20-22 (Dckt. No. 81-3). Second, Malkowski's "consistent threats to retire created instability at the company as they were vulnerable if he suddenly quit as no one else was capable of handling his job duties." *See* Def.'s Mem., at 9; *see also* B. Kujawinski Dep., at 218:14-25. Those reasons are not disability-based, so they rebut the presumption.

Accordingly, the burden reverts to Malkowski to prove pretext. Pretext "is not 'just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.'" *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389–90 (7th Cir. 2020) (cleaned up) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). To show pretext, a plaintiff must come forward with evidence that "(a) the

---

[15] As Malkowski observes, Cleveland Corporation didn't actually offer a legitimate, nondiscriminatory reason for his termination in the ADA section of its brief. *See* Pl.'s Mem., at 7 (Dckt. No. 92). But he did provide two legitimate, nondiscriminatory reasons in the ADEA section. *Id.*; *see* Def.'s Mem., at 9–11 (Dckt. No. 78). But the company made the point, so it put the ball in play. The company offered reasons why they let Malkowski go, so the Court will consider them.

employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quotation marks and citation omitted).

"[A] plaintiff would not succeed on her discrimination claim if the employer honestly believed its stated rationale for its adverse employment action, even if this honest belief was foolish, trivial, or baseless. But, a plaintiff would win her case if she showed that the stated reason, even if actually present to the mind of the employer, wasn't what induced the employer to take the challenged employment action, because that would constitute pretext." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 561 (7th Cir. 2019) (cleaned up).

Malkowski argues that the cost-cutting rationale was pretextual because (1) "there is a genuine issue of material fact as to whether Defendant actually saved $35,000.00 per year by terminating Plaintiff," and (2) the Kujawinski brothers "gave different reasons why Defendant terminated Plaintiff." *See* Pl.'s Mem., at 8 (Dckt. No. 92).

Malkowski's first point is incorrect. There is no genuine issue of material fact about whether Cleveland Corporation saved $35,000 per year by letting him go. Bob testified that it did. *See* B. Kujawinski Dep., at 216:20-22 (Dckt. No. 81-3). And Malkowski offered no counterevidence.

Malkowski asserts that Cleveland Corporation has offered no evidence – meaning no documentary back-up – supporting the cost savings. *See* Pl.'s Mem., at 8 (Dckt. No. 92). But Cleveland Corporation doesn't need any documents. The Federal Rules require evidence, and testimony is evidence. The Federal Rules do not require *documentary* evidence. Testimony suffices.

33

The company has met the burden of production by providing testimony about the cost savings. So, the ball is in Malkowski's court to come forward with evidence that the company's proffered rationale was pretextual. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, petitioners sustained their burden of production . . . .") (emphasis in original). Second-guessing the cost savings – without offering any evidence – doesn't do it.

Malkowski believes that there were no cost savings because the company expanded its accounting services. He argues that the company upgraded its accounting services, hired outside human resources, outsourced its payroll, added hours to Michael Kujawinski's day-to-day role, and brought in an accountant who provided more services than Malkowski. *See* Pl.'s Mem., at 8 (Dckt. No. 92). To Malkowski, "[t]he reasonable inference to be drawn here, in Plaintiff's favor, is the Defendant may have spent more on Plaintiff's replacement." *Id.*

Maybe so. Maybe more services cost more money. But that's a theory, not evidence. And "uncorroborated speculation does not prevent summary judgment." *Carothers v. County of Cook*, 808 F.3d 1140, 1153 (7th Cir. 2015) (dismissing speculative assertions in a retaliation case).

That said, Malkowski has offered other evidence that the termination was pretextual. As explained above, the record includes enough evidence for a reasonable jury to conclude that the company let him go because of his ongoing medical issues. He presented enough evidence to present a claim using the direct method. That same body of evidence is enough to support a finding of pretext under the indirect method, too.

There is one more step. To survive summary judgment, Malkowski "must specifically rebut *each* legitimate, non-discriminatory reason given by the defendants for" terminating his

position.  *See Reed v. Lawrence Chevrolet, Inc.*, 108 F. App'x 393, 398 (7th Cir. 2004)
(emphasis in original); *see also Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) ("The
fact that some of these reasons were successfully called into question by Russell's deposition or
affidavit does not defeat summary judgment if at least one reason for each of the actions stands
unquestioned.").  Here, the company offered a second reason for his departure:  Malkowski's
threats of retirement made the company feel unsteady.

The same analysis applies to that justification, too.  Malkowski presented sufficient
evidence to support a finding that his disability prompted his departure.  Maybe a jury will find
that the need for stability was the true reason that Malkowski had to go.  But the question now is
whether there is enough evidence to support a finding that the real reason was discriminatory.
And on this record, there is.

### 3. *Ortiz* Framework

Last, the Court turns to the *Ortiz* framework.  The Seventh Circuit has "tried to move
away from the many multifactored tests in employment discrimination cases and decide, when
considering the evidence as a whole, 'whether the evidence would permit a reasonable factfinder
to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the
discharge.'"  *Monroe*, 871 F.3d at 504 (quoting *Ortiz*, 834 F.3d at 765).

The evidence as a whole, viewed in a light favorable to Malkowski, could support a
possible claim for disability discrimination.  Malkowski had potentially recurring cancer and
arthritis that disrupted his life.  He received accommodations every time he requested them.  In
December 2016, he requested accommodations for an upcoming surgery in April 2017.  Shortly
before April, Malkowski told the company the exact date when he would take leave for medical
reasons in mid-April.  And that's when the company showed him the door.

The evidence doesn't *require* a finding that the company engaged in disability discrimination. Far from it. There are a lot of other moving parts. Malkowski repeatedly threatened to leave, which created instability. And there was financial instability, too. The company had financial challenges, and it says that it saved tens of thousands of dollars by letting him go.

Malkowski's case may not be overwhelming. And maybe it will not prove to be persuasive to the trier of fact. But the evidence is enough to live for another day under the *Ortiz* framework.

As a result, the Court denies Cleveland Corporation's motion for summary judgment on the ADA and the IHRA claims about his termination.

## B.    Failure to Accommodate

Malkowski's claims under the ADA and the IHRA involved a second theory, too. Malkowski alleged that Cleveland Corporation failed to accommodate his April 2017 surgery and recovery.[16]

"In order to establish a claim for failure to accommodate, a plaintiff must show that: (1) he is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Bunn*, 753 F.3d at 682; *see*

---

[16] There is one prefatory matter. Cleveland Corporation did not address Malkowski's failure to accommodate claim until its reply, despite requesting summary judgment on all claims. *See* Def.'s Reply, at 8 (Dckt. No. 101). Malkowski argues that the company, therefore, waived its right to challenge the claim. *See* Pl.'s Mem., at 9–10 (Dckt. No. 92). "[I]t is well-established that arguments raised for the first time in the reply brief are waived." *Mendez v. Perla Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011). But the company did move for summary judgment on the claim as a whole, even though it did not discuss the accommodation theory separately. And even then, the Court may grant summary judgment *sua sponte* "so long as the opposing party has had an adequate opportunity to respond." *Simpson v. Merchs. Recovery Bureau, Inc.*, 171 F.3d 546, 551 (7th Cir. 1999) (quoting *Sawyer v. United States*, 831 F.2d 755, 759 (7th Cir. 1987)); *see* Fed. R. Civ. P. 56(f). The Court concludes that the company sufficiently put the issue in play.

*also Kotwica v Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). If the plaintiff establishes those elements, then the burden shifts "to the employer to prove that the accommodation would impose on the employer an undue hardship as defined by the ADA." *Ford v. Marion Cty. Sheriff's Off.*, 942 F.3d 839, 850 (7th Cir. 2019).

Malkowski alleges that he requested a reasonable accommodation for his hip surgery and the procedures related to the mass in his lungs. *See* Def.'s Statement of Facts, at ¶ 105 (Dckt. No. 91). Specifically, he "asked for time off for the surgery and time off for physical therapy, and [he] told them that there would be a period of time that [he] would not be able to drive." *See* Malkowski Dep., at 22:15-19 (Dckt. No. 81-2); *id.* at 214:8-12 (discussing his April 18 surgery date and his inability to drive). He also states that Cleveland Corporation did not engage in an interactive process in considering his request, and ultimately did not accommodate him at all. *See* Def.'s Statement of Facts, at ¶¶ 106–07.

But the claim faces a basic problem. Malkowski wasn't working for the company when he had the procedures in question. The company decided on April 7 that his last day would be April 10. *Id.* at ¶ 54. His lung procedure took place on April 10, and his hip surgery was set for April 18. *Id.* The company couldn't accommodate him if he didn't work for the company.

Maybe the theory is that the company didn't accommodate his disability because they let him go *because of* his disability. But if so, it is duplicative of his termination theory. There is no need for a failure-to-accommodate theory, plus a termination theory, if they both involve the same thing.

If the failure-to-accommodate theory involves something else, Malkowski never says what it is. It is undisputed that the company never denied any request from Malkowski for

medical leave. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 69 (Dckt. No. 91) (admitting that "Plaintiff was never denied time off for medical reason[s]"); *id.* at ¶ 74 (admitting that "at no point did Cleveland Corporation deny him a request to take medical leave"). Maybe the theory is that the company failed to accommodate him by showing him the door. But again, that's a termination theory, wrapped in failure-to-accommodate cloth.

The Court grants Cleveland Corporation's motion for summary judgment on the claims about the failure-to-accommodate theory under the ADA and the IHRA.

## II.    Age Discrimination

Malkowski also brings age discrimination claims under the ADEA and the IHRA. He alleges that the company fired him because of his age, and did so without a legitimate business reason. *See* Cplt., at ¶¶ 63–68, 88–92 (Dckt. No. 1). The Court uses the same framework to analyze the age discrimination claim under each statute. *See Teruggi*, 709 F.3d at 659.

At the summary judgment stage, the question in an ADEA case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "[T]he plaintiff's age must have actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000) (quotation marks and citation omitted); *see also Ky. Ret. Sys. v. EEOC*, 554 U.S. 135, 143–48 (2008) (holding that pension calculations that accounted for age did not violate the ADEA because they were not "actually motivated by age") (quotation marks omitted); *Carson v. Lake County*, 865 F.3d 526, 532 (7th Cir. 2017) ("A plaintiff seeking to recover for disparate treatment under the ADEA must 'prove, by a preponderance of the evidence, that age was the

38

"but-for" cause of the challenged adverse employment action.'") (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).

Malkowski comes forward with no evidence of age discrimination. The claim rests solely on the fact "that Plaintiff's duties were absorbed by people younger than him." *See* Pl.'s Mem., at 10 (Dckt. No. 92). Malkowski himself says that he has no other proof:

> Q: Did – besides bringing in younger people, is there any other – anything else that would lead you to think that your termination, if you were indeed terminated, was due to your age?
>
> A: No I can't think of anything else.

*See* Malkowski Dep., at 64:19 – 65:1 (Dckt. No. 81-2).

Evidence that younger people took over his responsibilities, without more, is not enough to create a genuine issue of material fact about age discrimination. *See Victor v. ELA Area Pub. Libr. Dist.*, 2019 WL 3252232, at *16 (N.D. Ill. 2019) ("'[I]t simply cannot be enough in a termination case that the employer merely retain younger employees' despite terminating the plaintiff.") (quoting *Gadsby v. Norwalk Furniture Corp.*, 71 F.3d 1324, 1333 (7th Cir. 1995)). For the claims to pass muster, Malkowski would need "evidence about the job performance of the people that allegedly replaced him," "evidence that they engaged in conduct similar to [him]," or "evidence about them whatsoever, beyond their ages, their positions, and that they were hired into positions that involved performing some of the same tasks that [Malkowski] used to perform." *Id.*

Viewing the record in the light most favorable to Malkowski, no reasonable jury could find that Cleveland Corporation fired Malkowski because of his age. The Court grants Cleveland Corporation's motion for summary judgment on the age discrimination claims under the ADEA and the IHRA (Counts II and IV).

## III.   Retaliatory Discharge

The last count is an Illinois common law claim for retaliatory discharge.  Malkowski alleges that the company retaliated against him for two reasons.  First, he supported the idea of disclosing a potential liability in a footnote of a financial statement.  Second, he refused to sign paperwork for undocumented workers.  *See* Pl.'s Mem., at 13, 15 (Dckt. No. 92).  In his view, the company got rid of him for improper reasons.

Under Illinois law, "an at-will employee is generally subject to discharge for any reason or for no reason at all."  *Meister v. Ga.-Pac. Corp.*, 43 F.3d 1154, 1160 (7th Cir. 1995).  But retaliatory discharge serves as "an exception to this general rule."  *Id.*  "To establish a cause of action for the tort of retaliatory discharge, an employee must demonstrate the following three elements under Illinois law:  (1) an employee must establish that he has been discharged; (2) he must demonstrate that his discharge was in retaliation for his activities; and, (3) he must show 'that the discharge violates a clear mandate of public policy.'"  *Id.* (quoting *Hiatt v. Rockwell Int'l Corp.*, 25 F.3d 761, 767 (7th Cir. 1994)).

But a "well-established principle in Illinois retaliatory discharge cases [is] that '[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee.'"  *Id.* (quoting *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, Ill. Dec. 22, 601 N.E.2d 720, 728 (1992)).  If "the employer produces some valid reasons for the dismissals, the burden remains with [the plaintiff] to show that the employer's purported reasons are no more than a mere pretext."  *Id.*  A plaintiff proves pretext by showing "either that a retaliatory animus more likely motivated their employer, or that their employer's proffered explanations are unworthy of credence."  *Id.* at 1162.

Cleveland Corporation argues that Malkowski has not come forward with evidence of proximate causation. As before, the issue boils down to timing.

The claim involves a dispute about a financial statement, and a dispute about the financial forms for the workers (called I-9s). The dispute about the I-9s took place in mid-2016, and the dispute about the financial statement took place in late 2016. But Malkowski didn't leave the company until months later, in April 2017. In the company's view, there is too much water under the bridge – that is, too much time passed to allow for a reasonable inference of causation.

The Court agrees that Malkowski has failed to come forward with enough evidence for a reasonable jury to find causation. Lots of time separates the key events, and Malkowski came forward with no evidence to bridge the gap.

Both parties use Title VII case law to support their arguments, so the Court follows suit. To bring a claim, Malkowski needs to show a causal nexus between the protected activity and the adverse action. Sometimes the events are so close in time that temporal proximity creates an inference of causation. "A telling temporal sequence can establish that nexus." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (cleaned up). "As the period of time separating the two lengthens, the hint of causation weakens." *Id.*

The passage of time does not necessarily mean that there is no claim. But the greater the separation in time, the greater the need to buttress the causal nexus with a piece of some other evidence. "That is not to say that the plaintiff is precluded from making out a prima facie case of retaliation, but rather that additional proof of a causal nexus is necessary." *Id.* (citation omitted). Greater separation requires more support.

In *Davidson*, the Seventh Circuit noted that five months is too long to "by itself suggest a causal link." *Id.* It pointed to four months as outside the limit as well. *Id.* (citing *Hughes*, 967 F.2d at 1174–75).

Here, the timeline is especially attenuated for the first alleged retaliation, meaning the dispute about the I-9s. Malkowski refused to sign the documents in mid-2016, but was not let until April 2017. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶¶ 87, 110 (Dckt. No. 102). That's a lot of time, and not a lot of adverse action.

Malkowski argues that this timeline is wrong. Instead, he claims that there is evidence that "the incident [] arose once in 2013, twice in 2014 and 2015, and 3 times each in 2016 and 2017 – with 2 of the incidents in 2017 arising within a week of Plaintiff's separation." *See* Pl.'s Mem., at 15 (Dckt. No. 92).

Most of that story undermines Malkowski's argument because it involves conduct that was even older. The only possible exception is any dispute about the I-9s from 2017. But even then, Malkowski doesn't offer enough.

Malkowski offered no evidence that *he* refused to sign the I-9s in 2017. Instead, he suggests that in 2017 there "*could have been* instances where [he] complained about signing off on them." *See* Pl.'s Statement of Facts, at ¶ 110 (Dckt. No. 91) (emphasis added). And when asked about the I-9s at his deposition, Malkowski only remembered the 2016 refusals. *See* Malkowski Dep., at 51:13-16 (Dckt. No. 81-2). So there is a lot of speculation, but not a lot of evidence, about 2017.

Nothing else in the record supports a causal link between the I-9s and the termination. If anything, the evidence shows that the I-9s didn't play a role in the termination at all. *See* Pl.'s Resp. to Def.'s Statement of Facts, at ¶ 60 (Dckt. No. 91); Malkowski Dep., at 46:7-10 (Dckt.

42

No. 81-2) (admitting no one threatened him about the I-9s); J. Kujawinski Dep., at 152:13-17, 153:7-13 (Dckt. No. 81-4) (explaining that he was "[m]ore puzzled by it than upset" by Malkowski's decision, and that he had no knowledge of "displeasure" from anyone else); M. Kujawinski Dep., at 158:12 – 159:6 (Dckt. No. 89) (suggesting nothing about any parties being angry, but rather that the owners just once went "back and forth about" the I-9s). The record falls far short of what it would take to support a jury verdict.

The other alleged retaliation involved the 2016 financial statement. The exact timeline is disputed. The company says that the financial statements were due in December 2016, so the dispute must have taken place then. *See* Def.'s Mem., at 15 (Dckt. No. 78). Malkowski responds that they continued to fight about the issue until the first week of January 2017. *See* Pl.'s Mem., at 13 (Dckt. No. 92).

The difference makes no difference. Even if the squabbles about the financial statement spilled into early January, the simple reality is that the company did not let him go until early April. That's three months. That's a long stretch of time – and it's too much of a stretch to conclude that the termination had something to do with the financial statements.

Malkowski comes forward with case law, but it does not support his cause. The cases involve adverse employment actions that took place within a week – or a few weeks, tops – of the disputed conduct in question. *See Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1415 (7th Cir. 1989) (finding causation where the gap was one week); *Wittenberg v. Wheels, Inc.*, 963 F. Supp. 654, 662 (N.D. Ill. 1997) (finding causation when the protected activity was "consistently throughout the weeks immediately prior to her termination"). Three months is much closer to four months (recall *Davidson*) than it is to a week.[17]

---

[17] The Court acknowledges that some important events for the disability discrimination claim took place in December 2016. That's when Malkowski announced that he was going to have surgery. And months

Overall, Malkowski has offered evidence that he had a dispute with the company on two issues. But he doesn't offer evidence that those disputes had a causal relationship with the company's decision to part ways. Without evidence of causation, he cannot bring a claim. The Court grants summary judgment on his common law retaliation claim (Count V).[18]

### Conclusion

For the reasons stated above, Cleveland Corporation's motion for summary judgment is granted in part and denied in part.


Date: December 6, 2021

_____

Steven C. Seeger
United States District Judge

---

passed between December 2016 (when he announced his surgery) and April 2017 (when he left). But several important communications about the medical procedures took place in late March and early April, too. And that's not the situation when it comes to the 2016 financial statement and the I-9s.

[18] The company also argued that it had legitimate reasons for letting him go. But this Court does not need to reach that issue in light of the conclusion about causation.